IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, INC., BY ITS CONWAY BRANCH, ET AL., | ) ) ) ) ) | C.A. No. 4:03-1732-25TLW |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Written Opinion and Order |
| CITY OF MYRTLE BEACH, ET AL., | ) ) | |
| Defendants. | ) ) ) | |

This matter now comes before the Court upon the plaintiffs' February 24, 2005, motion for a preliminary injunction enjoining the City of Myrtle Beach, South Carolina, from implementing a one-way traffic pattern along Ocean Boulevard during "Black Bike Week" 2005.[1] According to the plaintiffs: (i) the plaintiffs will suffer irreparable harm if the one-way traffic pattern is employed during "Black Bike Week;" (ii) any harm to the City of Myrtle Beach is minimal because the City may use the "Harley Week" traffic plan for "Black Bike Week;" (iii) the plaintiffs are likely to prevail on their claims against the defendants; and (iv) the public interest will be served by granting the injunction. The defendants oppose this

---

[1] The undersigned notes that the terms "Black Bike Week" and "Harley Week" are the terms used by the parties in this case to describe the events at issue. Therefore, they shall be used by the Court herein. As described by the parties, annually each May, the Myrtle Beach, South Carolina area becomes a focal point for two motorcycle-related events. "Harley Week" occurs annually in mid-May and attracts predominantly white tourists. "Black Bike Week" occurs annually over Memorial Day Weekend and attracts predominantly African-American tourists.

motion. According to the defendants, "the Court should deny this motion because plaintiff cannot prevail on the underlying causes of action and the one-way traffic pattern is a necessary tool to help maintain control of Ocean Boulevard during Memorial Day Weekend." As well, the defendants argue that "the one-way traffic plan lacks racial motivation."

On April 25, 2005, the undersigned held a hearing relative to the instant motion. At that time, all parties were allowed to present their respective legal positions. After careful consideration of the legal argument of counsel, all relevant case and statutory law, all pleadings, and other evidence of record, this matter is now ripe for disposition.

## I. BACKGROUND

This case arises out of the City of Myrtle Beach's implementation of a one-way traffic pattern along Ocean Boulevard during the annual event referred to by the parties, and commonly known as, "Black Bike Week." Specifically, the one-way traffic plan requires that all traffic travel southbound on Ocean Boulevard for approximately five miles. Exit points off Ocean Boulevard during this five mile stretch are restricted. Law enforcement officials are deployed on both sides of this stretch of the boulevard. This traffic plan is implemented only once a year during the annual "Black Bike Week," which occurs during the Memorial Day Weekend.[2] According to the plaintiffs, the Memorial Day Weekend "is the only weekend [of the year] when a majority of the tourists and visitors along Ocean Boulevard in the City of Myrtle Beach are black."

---

[2]The defendants stated at the April 25, 2005, hearing that a one-way traffic pattern may be employed for a few hours after the Fourth of July fireworks display.

In contrast to "Black Bike Week," the City of Myrtle Beach has not imposed a similar traffic pattern during "Harley Week." Instead, the City permits two-way traffic along Ocean Boulevard during this event.[3] The parties agree that a majority of the tourists and visitors to the City of Myrtle Beach during "Harley Week" are white.

In response to the differing traffic patterns employed during "Black Bike Week" and "Harley Week," the plaintiffs initiated the instant lawsuit. In particular, the plaintiffs allege that: (i) the defendants deprived the plaintiffs of their constitutional rights pursuant to 42 U.S.C. § 1983; (ii) the City of Myrtle Beach's conduct deprived the plaintiffs of their rights under the Equal Protection Clause of the United States Constitution; (iii) the City of Myrtle Beach's conduct violates the protections of the Dormant Commerce Clause; and (iv) the defendants pattern or practice of discrimination by local law enforcement agencies that receive federal funding violates the provisions of the Safe Streets Act of 1968, 42 U.S.C. § 3789(c).

## II. STANDARD FOR PRELIMINARY INJUNCTION

In the Fourth Circuit, the entry of a preliminary injunction is governed by the four-part test set forth in <u>Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co., Inc.</u>, 550 F.2d 189 (4th Cir. 1977), which requires a court to consider "(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the requested relief is granted, (3) the likelihood that the plaintiff

---

[3]Prior to 1998, the City of Myrtle Beach permitted two-way traffic along Ocean Boulevard throughout both " Harley Week" and " Black Bike Week."

will succeed on the merits, and (4) the public interest." Scotts Company v. United Industries Corp., 315 F.3d 264 (4th Cir. 2002) (citing Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 812 (4th Cir. 1991)).

When deciding whether to grant a preliminary injunction, the court must first determine whether the plaintiff has made a strong showing of irreparable harm if the injunction is denied; if such a showing is made, the court must then balance the likelihood of harm to the plaintiff against the likelihood of harm to the defendant. Id. (citing Safety-Kleen, Inc. (Pinewood) v. Wyche, 274 F.3d 846, 859 (4th Cir. 2001) and Direx, 952 F.2d at 812). If the balance of the hardships "tips decidedly in favor of the plaintiff," then typically it will "be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." Id. (citing Rum Creek Coal Sales, Inc. v. Caperton, 926 F.2d 353, 359 (4th Cir. 1991) and Blackwelder, 550 F.2d at 195). But if the balance of hardships is substantially equal as between the plaintiff and defendant, then "the probability of success begins to assume real significance, and interim relief is more likely to require a clear showing of a likelihood of success." Id. (citing Direx, 952 F.2d at 808).

Importantly, preliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances. MicroStrategy Inc. v. Motorola, Inc., 245 F.3d 335, 339 (4th Cir. 2001).

### III. DISCUSSION

In deciding whether to grant a motion for preliminary injunction, Blackwelder first requires that this Court consider the likelihood of irreparable harm to the plaintiffs if the preliminary injunction is denied. In this regard, the plaintiffs allege that the defendants' conduct violates their constitutional rights. If proven, the plaintiffs' claims clearly favor granting the motion for a preliminary injunction, since irreparable injury would be inferred as a matter of law.[4] As recently explained by this Court in Faulkner v. Jones, 1994 WL 456621 (D.S.C. 1994):

> ...the courts of this country have consistently held that the violation of a constitutional right constitutes irreparable injury as a matter of law. Elrod v. Burns, 427 U.S. 347 (1976); Ross v. Meese, 818 F.2d 1132 (4th Cir. 1987); Deerfield Medical Center v. City of Deerfield Beach, 661 F.2d 328 (5th Cir. 1981).

This is true even where the impairment exists for only a minimal period of time. Doe by Doe v. Shenandoah County School Bd., 737 F. Supp. 913 (W.D. Va. 1990) (citing Joyner v. Lancaster, 553 F. Supp. 809, 815 (M.D.N.C. 1982)). Thus, the plaintiffs' claims weigh in favor of granting the plaintiffs' motion for a preliminary injunction.

Moreover, Blackwelder next requires that this Court consider the likelihood of harm to the defendants if the requested relief is granted in deciding whether to grant a motion for preliminary injunction. The plaintiffs assert, and the defendants do not significantly disagree, that:

---

[4] The merits of the plaintiffs' claim for alleged violation of the Equal Protection Clause shall be addressed below.

> ...any harm to the City would be minimal because it has the option to implement the same traffic plan for Black Bike Week as it does for Harley Week and other weekends that draw large crowds to Myrtle Beach.

(Plaintiffs' Memorandum in Support p.15)

Additionally, at the hearing held in this matter, legal counsel for the defendants represented that they could comply with any court order addressing the traffic patterns in this case without significant hardship. As a result, the second Blackwelder factor also weighs in favor of granting the plaintiffs' motion for a preliminary injunction.

Furthermore, the third factor required to be considered by this Court under Blackwelder is the likelihood that the plaintiffs will prevail on the merits. As noted, the plaintiffs allege, in part, that the defendants' conduct violates the Equal Protection Clause.

Generally, the Equal Protection Clause of the Fourteenth Amendment directs that all persons similarly circumstanced shall be treated alike. Washington v. Davis, 426 U.S. 229 (1976). The central purpose of the Equal Protection Clause is the prevention of official conduct discriminating on the basis of race. Id. at 240.

To state a claim under the Equal Protection Clause, the plaintiffs must establish that: (1) that they were treated differently from others who were similarly situated; and (2) that the treatment was intentionally based on impermissible considerations such as race. Front Royal & Warren Cty. Indus. Park Corp. v. Town of Front Royal, 135 F.3d 275 (4th Cir. 1998); LeClair v. Saunders, 627 F.2d 606 (2nd Cir. 1980). Thus, even when an administrative action disparately impacts members of a particular racial group, it will not be found to violate the Equal Protection Clause unless the plaintiff demonstrates that the action was motivated, at least in part, by an "invidiously discriminatory" intent. See Village of Arlington Heights v.

Metropolitan Housing Dev. Corp., 429 U.S. 252, 265 (1977); Sylvia Development Corp. v. Calvert County, Maryland, 48 F.3d 810 (4th Cir. 1995); Smith v. Town of Clarkton, 682 F.2d 1055, 1066 (4th Cir. 1982); and Talbert v. City of Richmond, 648 F.2d 925, 929 (4th Cir. 1981), cert. denied, 454 U.S. 1145 (1982).

In the present case, as to traffic patterns, it cannot be seriously disputed that the "Black Bike Week" visitors are being treated differently than the "Harley Week" visitors. In particular, the parties acknowledge that a one-way traffic plan is being implemented during the "Black Bike Week" and a two-way traffic plan is being implemented during the "Harley Week." Although the defendants contend otherwise, insufficient evidence has been presented upon which it can be concluded that the "Black Bike Week" visitors are not similarly situated to "Harley Week" visitors at this stage of litigation. In addition, the plaintiffs have presented credible expert testimony that there were no significant differences that warranted the differences in traffic plans. Specifically, former Police Chiefs Willie R. Williams and Mitchell W. Brown opined that:

> [They] did not observe any behavior, crowd size, or other basis that warranted the difference in traffic patterns and police practices observed during Black Bikers' Weekend compared to Harley Weekend.
>
> (Pl. Ex. 16)

Likewise, Dr. David B. Clarke opined that:

> The size of the two events is similar, and there is no clear reason why the Harley Week traffic control plan should not be used for both events.
>
> (Pl. Ex. 6)

In fact, City of Myrtle Beach Mayor Mark McBride also testified that the events were "similar" in size. (Pl. Ex. 1; McBride Dep. p. 37, 95).

In sum, insufficient evidence is contained within the record upon which it can be concluded that either the number of tourists or the age of the tourists during the two motorcycle events was substantially different. General assertions and an affidavit submitted by a local hotel owner indicating that the tourists of the motorcycle events are different are insufficient to show that the tourists who attend the two events are not similarly situated. Thus, the undersigned concludes that the plaintiffs have presented sufficient evidence that they are treated differently from others who were similarly situated. However, "such a disparity in racial impact alone does not call for strict scrutiny." Village of Arlington Heights, 429 U.S. at 259.

Instead, this Court is required to next consider the question of discriminatory intent. It is this factor which is the most critical issue in resolution of this dispute.

Several factors have been recognized as probative of whether a decisionmaking body was motivated by a discriminatory intent, including: (1) evidence of a consistent pattern of actions by the decisionmaking body disparately impacting members of a particular class of persons; (2) historical background of the decision, which may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents; (3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and (4) contemporary statements by decisionmakers on the record or in minutes of their meetings. See Sylvia, 48 F3d. at 820; Arlington Heights, 429 U.S. at 266-68; and Talbert, 648 F.2d at 929. In the end, the plaintiff

has the burden of establishing that a classification introduced through administrative action was "clear and intentional." Sylvia, 48 F3d. at 820.

The parties agree that Memorial Day Weekend is the only weekend of the year where African-American visitors clearly outnumber white visitors to the City of Myrtle Beach, South Carolina. Notably, Memorial Day Weekend is the only weekend of the year when a one-way traffic pattern is implemented by the defendant City of Myrtle Beach. The parties do not seriously dispute these facts. The City of Myrtle Beach admits that the "traffic and police practices for [Memorial Day] weekend impact more blacks than whites." (Pl. Ex. 5).

Likewise, the record reflects that, prior to 1998, the City of Myrtle Beach historically viewed those attending "Black Bike Week" and "Harley Week" as being similarly situated. Prior to 1998, traffic was allowed to flow both ways along Ocean Boulevard for both events.

In addition, a number of statements made by City of Myrtle Beach officials show that race was discussed and considered when decisions concerning "Black Bike Week" traffic patterns were made. For example, in 1995, then Police Captain Warren Gall explained that the Police Department should:

> ...be careful about being accused of double standards. We should treat everyone [attending] this [Black Biker's] week-end fairly leaving no perception that we're altering our approach or enforcement philosophy from [Harley Week held] last week-end...

 (Pl. Ex. 33)

"Harley Week" tourists were also described by city officials in the record as being "more law abiding" and better behaved than "Black Bike Week" tourists. (Pl. Ex. 1). As noted, the vast majority of "Harley Week" tourists are white and the vast majority of "Black

Bike Week" tourists are African-American. Similarly, statements were made by a city official that:

> ...if the government enforces the law and makes and holds the black biker contingency to the same expectation of any other weekend of the year, the majority of the group won't come because all they want to come, is to have a party. [sic].

(Pl. Ex. 1)

There is also evidence in the record that those tourists who come during "Black Bike Week," a vast majority of which are African-American, were "discouraged" from coming to Myrtle Beach. (Pl. Ex. 1). Again, such evidence may be considered as evidence that race was a motivating factor when the issue of traffic plans was decided.

Testimony of City of Myrtle Beach Manager Tom Leath also indicated that tourists of "Black Bike Week" "party differently" and "wanted to take over the street." (Pl. Ex. 2; Leath Dep. p. 128, 158, 199-200). Specifically, Mr. Leath testified that:

> ...[The Black Bike Week tourists] wanted to take over the street to party, to socialize, to dance, to take pictures, you know, and we just couldn't have that.

(Pl. Ex. 2; Leath Dep. p. 158)

These statements were made in connection with "Black Bike Week" and impacted the traffic pattern decision. The Court concludes, at this stage of the proceedings, that race was a motivating factor when the issue of traffic plans was decided.

While the statements detailed above could be found to be without racial animus, such statements are sufficient at this stage to support the plaintiffs' position that race was a motivating factor in the decision to implement the traffic plans at issue.

This Court has reviewed a number of decisions that relate to the applicable standard of review. The cases do not provide clear certainty as to the applicable standard and the analysis process. However, the Court concludes, in the analysis of this issue at this time, that where, as here, the challenged action classifies any group by race, such actions should be analyzed under strict scrutiny. Adarand Constructors v. Pena, 515 U.S. 200, 227 (1995). As succinctly explained by the United States Supreme Court in Adarand:

> ...all governmental action based on race--a group classification long recognized as "in most circumstances irrelevant and therefore prohibited... should be subjected to detailed judicial inquiry to ensure that the personal right to equal protection of the laws has not been infringed...."[A] free people whose institutions are founded upon the doctrine of equality," should tolerate no retreat from the principle that government may treat people differently because of their race only for the most compelling reasons. Accordingly, we hold today that all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests. (Citations omitted).

Id. at 228.

Because racial characteristics so seldom provide a relevant basis for disparate treatment, and because classifications based on race are potentially so harmful to the entire body politic, "it is essentially important that the reasons for any such classification be clearly identified and unquestionably legitimate..." Id. at 237.

In the present case, the defendants assert that compelling reasons exist for the implementation of a different traffic pattern during "Black Bike Week" than the one used during "Harley Week." Specifically, the defendants argue that a more-restrictive traffic pattern is necessary during "Black Bike Week" due to increased traffic gridlock and an

increased need for safety. However, such justifications "must be substantiated by objective evidence–mere speculation or conjecture is insufficient" to meet strict scrutiny justification. Patrolmen's Ben. Ass'n. New York, 310 F.3d 43 (2nd Cir. 2002). The defendants fail to show that a one-way traffic pattern clearly reduces congestion or is more accessible to emergency vehicles than a two-way traffic pattern. Specific, persuasive evidence was not offered by the defendants at this stage of the legal proceedings.

To the contrary, the record reflects that Dr. David B. Clarke noted "[t]he traffic control plan for Black Bike Week greatly restricts the flow of traffic along Ocean Boulevard, resulting in congestion and contributing to a high level of driver discomfort." (Pl. Ex. 6). Dr. Clarke also noted that he "did not observe any reason why [the traffic pattern implemented during "Harley Week"] could not be employed during Black Bike Week," since "[t]raffic moves much more smoothly during Harley Week." Importantly, Dr. Clarke further opined that he did not "observe any behavior in the pedestrian or motor traffic along Ocean Boulevard that would have warranted a difference in the traffic control plan between the two events." (Pl. Ex. 6).

Similarly, Retired Police Chiefs Willie R. Williams and Mitchell W. Brown opined that:

> ...the traffic pattern for Black Bikers' Weekend does not achieve the goals of facilitating the free flow of traffic, minimizing gridlock, and providing for public safety. In fact, the traffic pattern exacerbates the traffic problems and gridlock along Ocean Boulevard and Kings Highway, by imposing a one-way traffic flow, restricting the number of opportunities to exit from Ocean Boulevard, and allowing the traffic lights to operate in normal fashion without active direction by law enforcement. The pattern creates anxiety and frustration for bikers and motorists. It also creates an environment for motorist-pedestrian interaction, which undermines public safety.

> The traffic pattern for Harley Week facilitated a fairly free flow of traffic in both directions along Ocean Boulevard. We have not observed any reason why this traffic pattern could not be used for Black Bikers' Weekend...
>
> We did not observe any behavior, crowd size, or other basis that warranted the differences in traffic patterns...during Black Bikers' Weekend compared to Harley Weekend.
>
> (Pl. Ex. 16)

In fact, the defendants' traffic expert, Mr. Terry N. Snow, made similar observations of downtown Myrtle Beach. Specifically, Mr. Snow testified that:

> ...during [Black] Biker Week and, in addition, during Harley Week and in the major height of the weekend season along Ocean Boulevard, traffic is congested because of the cruising activities...
>
> ...during all of those events, during Harley Week and Biker Week, it's bumper to bumper traffic...
>
> ...There is congestion under any circumstance during the summer months, and traffic moves at such a slow rate that you could actually walk faster than you could drive.
>
> (Pl. Ex. 40)

Such evidence conflicts with the defendants' proffered compelling reasons for their actions. Accordingly, the undersigned concludes that the defendants have not shown a "compelling" basis for treating the two motorcycle events differently.

As well, although the defendants assert that the tourists of the two motorcycle events are not similarly situated, the undersigned disagrees for the reasons stated above. As noted, in addition to the plaintiffs' experts, Mayor McBride testified that the events were "similar" in size and that traffic congestion problems on Ocean Boulevard existed "any Saturday throughout the summer." (Pl. Ex. 1). City Council Member Michael Chestnut also testified

that the two biker events were "similar" because "people come here to ride bikes and come here for the...fellowship and networking." (Pl. Ex. 38). Consequently, the tourists of the two motorcycle events cannot be treated differently, since they are similarly situated.

For these reasons, the undersigned also concludes that there is a likelihood that the plaintiffs may prevail on their claims of alleged violations of the Equal Protection Clause. Accordingly, the third Blackwelder factor also weighs in favor of granting the plaintiffs' motion for a preliminary injunction.[5]

The fourth and final factor to be considered by this Court under Blackwelder in determining whether to grant the plaintiffs' motion for a preliminary injunction is the public interest. Having concluded that the first three Blackwelder factors weigh in favor of the plaintiffs, the undersigned concludes that the public interest would best be served by the issuing of a preliminary injunction in this case.

This Court has found one case which deals with a traffic management plan. In Florida State Conference of NAACP Branches v. City of Daytona Beach, Florida, 54 F. Supp.2d 1283 (M.D. Fla. 1999), legal action was brought against the City of Daytona Beach seeking a preliminary injunction barring the implementation of a traffic management plan used to bar vehicular beach traffic during black colleges reunion week. In that case, the District Court granted the plaintiffs' motion for a preliminary injunction and concluded that the city's use of the traffic plan during black colleges reunion, when it was not used during other events involving large crowds, violated the Equal Protection rights of the reunion participants.

---

[5]In light of the undersigned's conclusion relative to the likelihood of success of the plaintiffs' Equal Protection Clause claim, the undersigned need not address the merits of the plaintiffs' remaining claims.

Although the issues were not the same, <u>Florida State Conference of NAACP Branches</u> has persuasive effect.

## IV.  CONCLUSION

For the foregoing reasons, the plaintiffs' motion for a preliminary injunction is **GRANTED**, to the extent that the defendants shall maintain a substantially similar traffic pattern during both the "Black Bike Week" and the "Harley Week." The defendants shall be free to determine whether a one-way traffic pattern, a two-way traffic pattern, or another traffic pattern shall be implemented for both events.

    **IT IS SO ORDERED.**

s/   Terry L. Wooten  
Terry L. Wooten  
United States District Court Judge

May 9, 2005  
Florence, South Carolina